IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Harold L. Holmes,                          )
                                           )        Civil Action No. 6:03-3073-10AK
                         Plaintiff,        )
                                           )    **REPORT OF MAGISTRATE JUDGE**
            vs.                            )
                                           )
Jo Anne B. Barnhart,                       )
Commissioner of Social Security,           )
                                           )
                         Defendant.        )
_____)

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for DIB and SSI on September 1, 1998, and August 25, 1998, respectively, alleging a disability onset date of December 31, 1996, due to a weak right arm, left knee and right thigh problems, arthritis, asthma, hernia surgery, and a

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

nerve condition (Tr. 63, 83). His applications were denied initially and upon reconsideration (Tr. 35-36, 281, 286-289). The plaintiff then requested a hearing before an administrative law judge (ALJ) which was held June 8, 2000 (Tr. 290-328). The ALJ issued a decision on August 30, 2000, denying his claim (Tr. 12-20). The Appeals Council denied the plaintiff's request for review on March 16, 2001 (Tr. 6-7). The plaintiff then filed a civil action for judicial review.

On November 16, 2001, on motion of the Commissioner, this court remanded the case for a comprehensive credibility evaluation as required by 20 C.F.R. §§404.1529, 416.929 and Social Security Ruling (SSR) 96-7p (Tr. 353-54). On January 15, 2002, the Appeals Council entered an order remanding the case for further proceedings (Tr. 355-56). A supplemental hearing was held on June 11, 2002 (Tr. 493-529). On September 17, 2002, the ALJ issued a decision denying the plaintiff's claims and made the following findings (verbatim):

> (1)    The claimant met the disability insured status requirements of the Act on December 31, 1996, the date he stated he became unable to work, and continues to meet them through at least June 30, 2002.
>
> (2)    The claimant has not engaged in substantial gainful activity since December 31, 1996.
>
> (3)    The medical evidence establishes that the claimant has impairments in combination, including degenerative disc disease, history of multiple hernias, lacerations to the legs and arms, diabetes, asthma, antisocial personality disorder, depression, and anxiety, but he does not have an impairment or combination of listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.
>
> (4)    The claimant's allegations of pain, depression, side effects from medications and other subjective symptoms occurring with such frequency and severity as to preclude even unskilled light work are not supported by the overall evidence of record, including his description of daily activities, his use of medications, the medical assessments of the examining physicians, and the objective clinical and laboratory findings.

2

(5)     The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for jobs requiring frequent lifting or carrying of more than twenty pounds, or jobs not restricted to routine, repetitive tasks involving one-to-two instructions in a low stress environment not requiring contact with the public (20 CFR 404.1545 and 416.945).

(6)     The claimant is unable to perform his past relevant work as a quarry machine operator or debarking machine operator which required at least heavy exertion.

(7)     The claimant's residual functional capacity for the full range of light work is reduced by the nonexertional limitations set forth in Finding No. 5 above.

(8)     The claimant is now closely approaching advanced age at 50 and was a younger individual at 44 on his alleged onset date (20 C.F.R. §§ 404.1563 and 416.963).

(9)     The claimant has a high school equivalency degree (20 C.F.R. §§ 404.1564 and 416.964).

(10)     The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work functions of other work (20 C.F.R. §§ 404.1568 and 416.968).

(11)     Based on an exertional capacity for light work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rules 202.14 and 202.21, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

(12)     Although the claimant's additional nonexertional limitations do not allow him to perform the full range of light work, using the above-cited rules as a framework for decision-making, there are a significant number of jobs in the national economy which he could perform.  Examples of such jobs are: hand packager, of which there are 3,470 in the State of South Carolina and 1,281,000 in the United States; inspector, 3,100 in the State and 625,000 in the nation; and routing clerk, 2,700 and 239,000 respectively.

(13)     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. 404.1520(f) and 416.920(f)).

3

(Tr. 344-45).

On August 11, 2003, the Appeals Council denied the plaintiff's request for review, thus making the ALJ's decision the Commissioner's "final decision" for purposes of judicial review (Tr. 329-30).  *See* 42 U.S.C. §405(g); 20 C.F.R. §404.981 (2003).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## EVIDENCE PRESENTED

The plaintiff was born on July 13, 1952; he was 44 years old when he allegedly became disabled and 50 years old at the time of the hearing (Tr. 275, 346, 500).  He attended school through the eleventh grade, received a GED in the military, and has past relevant work experience as a jackhammer operator and debarker machine operator (Tr. 67).

### Medical Evidence

The plaintiff sustained a work-related injury on December 31, 1996, when a grinding stone disintegrated and struck him causing lacerations to his right arm and thigh and pain in his left bicep and left knee.  Physical examination showed that the left bicep had a small contusion with ecchymosis and significant soft tissue swelling; the left knee showed signs of ecchymosis and moderate swelling; the right forearm had a gaping jagged laceration (which was repaired); and the right thigh had a very small superficial laceration and signs of abrasions (Tr. 99).  X-rays of the right femur, left humerus, left knee, and right forearm showed no fractures (Tr. 102-105).

Orthopaedic examination by Dr. Thomas G. Fleischer on February 19, 1997, showed good motor and sensory functioning of both upper extremities.  The plaintiff's lacerations were "well-healed," and he had no major nerve injury, excellent quad tone, and

4

full range of motion of the lower extremities.  Dr. Fleischer recommended that the plaintiff take over-the-counter Ibuprofen and perform quad-strengthening exercises.  He also authorized the plaintiff to return to work on February 20, 1997 (Tr. 107).

On March 12, 1997, the plaintiff saw Dr. J. A. Furse for complaints of "altered sensation" and right-sided weakness.  Physical examination revealed no thickening and slight increased sensitivity on palpation over the right mid thigh.  Dr. Furse restricted the plaintiff to work only half-days, with minimal squatting and "light work with no lifting over 40 pounds" (Tr. 122).

On March 25, 1997, the plaintiff was hospitalized for the repair of an incisional hernia with multiple hernias throughout the incision.  He tolerated the operation "quite nicely" and was discharged three days later in good condition and ambulatory (Tr. 108-15).

On April 10, 1997, the plaintiff saw Dr. W. Lee Thomas for a follow-up appointment regarding leg pain.  Dr. Thomas noted the plaintiff was doing "okay with his leg" and returned him to work without restrictions (Tr. 116-17).

On May 16, 1997, the plaintiff presented to Dr. Gal G. Margalit, a family practitioner, for a physical evaluation.  "All special tests [of the left knee] [were] negative" and the right knee had a normal range of motion.  Cranial nerves two through twelve were also normal.  Dr. Margalit opined that the plaintiff had sustained a physical impairment functional loss of five percent to the right upper extremity, ten percent to the right lower extremity, five to ten percent to the left lower extremity, and ten percent to the whole person based on his hernia.  Dr. Margalit further opined that the plaintiff should consider changing his job since he was no longer able to perform it (Tr. 128-30).

On August 19, 1997, the plaintiff presented to Dr. Elma D. Whidby, an internist, with complaints of low back pain.  Physical examination showed his extremities were normal and his back had some mild paraspinous tenderness in the lumbar region.  X-rays of the plaintiff's lumbosacral spine taken on August 20, 1997, showed degenerative disc disease

5

but no acute ossesous abnormalities.  On September 9, 1997, the plaintiff reported to Dr. Whidby that his back pain was better with the Mag-Sal.  Physical examination showed no hernia in the area of the hernia repair, and his extremities were non-edematous with no cyanosis or clubbing (Tr. 133, 46).

In November 1997, the plaintiff presented to Dr. Whidby with audible wheezing and a pulse oximeter reading of 96%.  Dr. Whidby diagnosed the plaintiff with asthmatic bronchitis and treated him with a hand held nebulizer.  Dr. Whidby noted that the plaintiff "dramatically opened up" after the treatment and that she could not hear any subsequent wheezing, rales, rhonci, or other adventitial sounds (Tr 144).

On January 19, 1998, the plaintiff underwent a psychological evaluation by staff psychologist Dr. W. Birt Dowling.  The plaintiff's thought processes were intact as well as his overall cognitive functioning.  Dr. Dowling noted a prior history of alcoholism related to an antisocial personality disorder, a history of domestic violence, and assault and battery resulting in a prior incarceration for which the plaintiff was still on probation.  Dr. Dowling diagnosed the plaintiff with suspected chemical dependency and antisocial personality disorder (Tr. 136-38).

On January 26, 1998, the plaintiff underwent a consultative examination performed by Dr. James M. Timmons, Jr., for complaints of "stinging, burning pain in the leg" and difficulty walking two blocks before he experienced "disabling pain."  Physical examination revealed a full range of motion of the upper extremities with "no real tenderness," a scar over the right medial thigh with no deformity or tenderness present, and a full range of motion of the hips, knees, ankles and back.  He was also able to stoop and squat without difficulty and had normal strength and joint movement.  Further, there was no palpable hernia noted.  Dr. Timmons diagnosed the plaintiff with back and leg pain and status post hiatal and ventral hernia repair (Tr. 139-40).

6

In February 1998, the plaintiff was treated by Dr. Whidby for anxiety and back and shoulder pain.  The plaintiff reported that his back felt a "little bit better" after taking Daypro.  Dr. Whidby noted that the plaintiff's neurological examination and extremities were normal (Tr. 143).

From March 1998 through December 1998, the plaintiff participated in the South Carolina Vocational Rehabilitation Program.  Initial testing by evaluator Dawna Layman indicated the plaintiff was a suitable candidate for equipment operations and craft arts positions at the light exertional level but the plaintiff had a poor attitude and was "convinced that he [was] too disabled to get and hold a job."  Vocational progress notes showed that he did well, had good attendance and by the end of training could perform a full work day with scheduled breaks.  The plaintiff quit the program for "personal reasons" on December 10, 1998 (Tr. 190-202).

In April 1998, the plaintiff was admitted to the G. Werber Bryan Psychiatric Hospital after increased alcohol consumption and homicidal and suicidal threats toward his wife.  The plaintiff was discharged with a diagnosis of alcohol dependence and personality disorder and was instructed to take Zoloft (Tr. 164-80).

In June 1998, the plaintiff underwent an intake evaluation by the Santee-Wateree Mental Health Clinic (Santee-Wateree).  The plaintiff was diagnosed with depressive disorder and alcohol abuse and assessed with a Global Assessment Functioning (GAF) score of 60.[2]  The plaintiff was started on Elavil, an antidepressant.  Treatment notes from Santee-Wateree indicated that, on July 13, 1998, the plaintiff reported that his medication was helping him "so much."  The plaintiff was fully oriented, memory and attention were good, and concentration was adequate.  In August 1998, the plaintiff again reported that his medication

---

[2]A GAF score between 51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peer or co-workers).  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

was helpful in reducing his symptoms and that he was functioning adequately. In September 1998, treatment notes from Santee-Wateree indicated that the plaintiff's GAF score had increased to 65;[3] he had a better attitude, was sleeping well, and reported no side effects from his medications. In November 1998, treatment notes indicated that the plaintiff's medications were effective in managing his symptoms and that continued treatment was necessary to maintain stability and functioning (Tr. 212-28).

On January 8, 1999, the plaintiff underwent a psychiatric evaluation performed by Dr. David Downie, IV. The plaintiff reported that he had been sober for six months and was receiving outpatient psychiatric treatment. Psychological testing showed "marked depression." He was fully oriented, and his attention span was grossly normal. Immediate and remote memory were intact, however, he was unable to do serial 7's. There was no evidence of delusional thinking, hallucinations, or evidence of formal thought disorders. Dr. Downie diagnosed the plaintiff with dysthymic disorder and status post alcohol dependency in remission (Tr. 203-04).

On January 15, 1999, Dr. Edward D. Waller, a State agency psychological consultant, reviewed the plaintiff's file and completed a psychiatric review technique form. Dr. Waller opined that the plaintiff had slight limitations in restrictions of activities of daily living and in maintaining social functioning, often had deficiencies of concentration, persistence or pace, and never had episodes of deterioration or decompensation. Dr. Waller found the plaintiff moderately limited in his ability to understand, remember, and carry out detailed instructions. He opined that the plaintiff could perform simple tasks for two plus hours with no special supervision, could maintain a regular work schedule, could interact appropriately with others, and could make simple work-related decisions (Tr. 243-53).

---

[3]A GAF score between 61-70 is indicative of some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. See DSM-IV, supra.

On January 25, 1999, Dr. Sharon Silverman, a family practitioner, performed a consultative examination. The plaintiff reported the only medication he was taking on a regular basis was Elavil. He also reported smoking two packs of cigarettes a day but was trying to stop. Physical examination revealed his extremities were without cyanosis, clubbing, or edema. His upper extremities showed a full range of motion of both shoulders and elbows, without tenderness. Motor strength was 5/5 for the upper extremities, 4/5 for the right lower extremity, and 5/5 for the left lower extremity. X-rays of the right shoulder showed some osteophyte formation and lumbosacral spine films showed degenerative disc disease from L1-2 and L5-S1 (Tr. 205-06).

On March 9, 1999, a pulmonary functioning test showed the plaintiff's one-second forced expiratory volume (FEV1, force vital capacity (FVC), and FEV1/FVC ratio were normal (Tr. 209).

Treatment notes from Santee-Wateree dated March 15, 1999, indicated that the plaintiff was sleeping well with Elavil and his symptoms were stable (Tr. 217). Treatment notes from June 1999 similarly showed that the plaintiff was doing well, sleeping "good" and had no side effects from his medications (Tr. 216). On October 26, 2000, the plaintiff described his depression as "so, so" (Tr. 378).

In February and March 2001, the plaintiff saw Dr. Richard L. North for a follow-up on his depression and diabetes. Dr. North noted that the plaintiff looked less depressed and increased his Zoloft (Tr. 402-03).

In June 2001, treatment notes from Dr. Guy B. Kahler indicated that the plaintiff's diabetes was asymptomatic, he had no complaints of side effects from his medications and his depressive symptoms had improved while on Zoloft (Tr. 396).

On October 29, 2001, the plaintiff "dropped out of services" at Santee-Wateree (Tr. 376).

9

On July 17, 2002, the plaintiff underwent a psychiatric evaluation with Dr. Timothy Malone.  Mental status examination showed appropriate thought processes with average intellectual functioning, with depressed mood and blunted affect.  Dr. Malone diagnosed the plaintiff with major depression and prescribed Remeron and Ambien (Tr. 491-92).

### Hearing Testimony

At his hearing on June 2, 2000, the plaintiff testified that he participated in mental health counseling every five months for medication management, and that he was no longer using alcohol (Tr. 294, 295, 311).  He stated that his hernia surgery prevented him from lifting anything over five pounds (Tr. 299), but later testified he could lift a gallon of milk with both hands (Tr. 318).  The plaintiff stated he could walk about half the length of a football field, but could not run (Tr. 300), and could sit for about an hour or two before he needed to change positions (Tr. 317).  He testified his asthma was controlled with inhalers (Tr. 301), that he had arthritis in his neck and back and his right hand swelled (Tr. 301, 302), and that he had a "skin disease" for which he took medication (Tr. 304).  The plaintiff alleged weight gain as a side effect of his medication (Tr. 294).   He stated his niece and sister did the cooking and cleaning, and he spent the day reading and listening to "Jesus tapes" (Tr. 302-303, 305).  The plaintiff also testified the could read the funny pages, cartoon papers, and comic strips (Tr. 305-306), and that he worked at rehabilitation for six months (Tr. 310).

Debra Lynn Holmes, the plaintiff's wife, also testified at the June 8, 2000, hearing.  Mrs. Holmes testified that the plaintiff had gained weight since taking Elavil for his depression (Tr. 321).  She testified that the plaintiff no longer drank alcohol and that his medication "mellowed" him out (Tr. 321).  She stated that the plaintiff's concentration and memory were not very good, that he slept most of the time (Tr. 321), and that his speech had slowed down due to the Elavil (Tr. 326).

10

A supplemental hearing was held on June 11, 2002. At that hearing, the plaintiff testified that he had not consumed any alcohol in three years (Tr. 501), that he took Elavil (as needed), Zoloft, Albuterol, Flovent, and Glucophage (Tr. 502, 530), and that he no longer received treatment at the mental health clinic, but through his primary care doctor (Tr. 502). He stated that Elavil helped his pain, and his diabetes was controlled with Glucophage (Tr. 510, 521). The plaintiff reported sleepiness as a side effect of Elavil (Tr. 531). He reported that he had been diagnosed with emphysema, as well as asthma, but he continued to smoke (Tr. 515). He stated that depression affected his concentration, memory, and ability to sleep (Tr. 519-520). The plaintiff stated he could pick up a gallon of milk with both hands, but not on a repetitive basis (Tr. 508-509); that if he walked 100 feet his right leg would give him trouble (Tr. 509); that he could sit for about one to two hours before needing to change positions (Tr. 510); that he could "creep" and crawl with some difficulty (Tr. 510); and that he swept and helped with the laundry (Tr. 523).

The plaintiff's wife also testified at the supplemental hearing, stating that the plaintiff took just Tylenol "sometimes" for pain (Tr. 534); that he had a lifting restriction of 20 pounds because of his hernia (Tr. 535); that he spent his day sitting on the porch, watching television, and sleeping (Tr. 535); and that his concentration and short term memory were not good, and his thought process was slow (Tr. 536). With regard to daily activities, Mrs. Holmes testified that the plaintiff might put clothes in the dryer, make coffee, tend to the tomato plants, hold his grandchild, and go grocery shopping with her (Tr. 537, 539). She stated the plaintiff had no problems taking care of his personal needs, grooming, and dressing (Tr. 539).

### Vocational Testimony

The ALJ also received testimony from Feryal Jubran, a vocational expert (VE). Ms. Jubran described the plaintiff's past relevant work as a jackhammer operator and

11

debarker machine operator as heavy to very heavy, unskilled work (Tr. 540).  The ALJ asked

Ms. Jubran to assume the following:

> [A]n individual of [Plaintiff's] age and education . . .[,] who ha[d]
> a high school equivalency diploma[,] [a]nd who ha[d] the work
> experience you just described, and the diagnosed impairments
> of degenerative disc disease, diabetes, hernias, depression, and
> an anti-social personality disorder[,] [a]ll of which limit him . . . to
> lifting, carrying, and handling no more than 20 pounds on an
> occasional basis, and no more than 10 pounds frequently.
> Assume that the individual [was] restricted to the performance of
> routine repetitive tasks, involving simple, one and two step
> instructions . . . .

(Tr. 541.) Ms. Jubran identified the light, unskilled jobs of hand packager, (3,470 jobs existing

in South Carolina and 1,281,000 jobs existing in the nation economy); inspector (3,100 jobs

existing in South Carolina and 625,000 jobs existing in the national economy); and routing

clerk (2,700 jobs existing in South Carolina and 239,000 jobs existing in the national economy

(Tr. 542).


### Administrative Decision

The ALJ followed the five-step sequential evaluation process to determine that

the plaintiff was not disabled.  At the first step, he found the plaintiff had not engaged in

substantial gainful activity since the alleged onset of disability (Tr. 337, Finding 2).  At the

second step, the ALJ found that the plaintiff suffered from an impairment or a combination

of impairments considered "severe" (Tr. 337, Finding 3).  At the third step of the sequential

evaluation, however, the ALJ found that the plaintiff's impairments did not meet or medically

equal a listed impairment (Tr. 337, Finding 4).

At the fourth step, the ALJ assessed the plaintiff's residual functional capacity

(RFC) during the insured period and determined that he retains the RFC to perform unskilled

light work not requiring frequent lifting or carrying of more than 10 pounds frequently or 20

pounds occasionally in routine, repetitive tasks involving one to two-step instruction in a low

12

stress environment not requiring public contact (Tr. 343, Finding 5).  In reaching this conclusion, the ALJ considered the relevant medical evidence and the hearing testimony regarding the plaintiff's symptoms and limitations, including the plaintiff's subjective complaints.  Based upon this RFC, the ALJ found that the plaintiff's impairments precluded him from performing his past relevant work activity (Tr. 343, Finding 6).  At the fifth step of the sequential evaluation, the ALJ found that, although the plaintiff could not perform the full range of light work, there were a significant number of jobs in the regional economy that he could perform (Tr. 343, Finding 12).  Therefore, the ALJ found that the plaintiff was not under a "disability" as defined by the Social Security Act (Tr. 343, Finding 13).

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful

13

employment. 20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. § 404.1503(a); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82-62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a *prima facie* showing of disability by showing that he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id*.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.

14

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## ANALYSIS

The plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence and that the ALJ erred by finding his allegations not fully credible.

### *Residual Functional Capacity*

Social Security regulations require the ALJ to "do a residual functioning capacity assessment." 20 C.F.R. §416.920a(c)(3). The responsibility for determining a claimant's RFC rests with the ALJ, and the ALJ can determine the value to give a medical source's opinions according to the factors listed in 20 C.F.R. §404.1527(d). Further, the determination of a claimant's residual functioning capacity lies with the ALJ, not a physician, and is based upon all relevant evidence. 20 C.F.R. §§404.1545(a), 404.1546, 416.945(z), 416.946.

After reviewing the medical and nonmedical evidence, the ALJ concluded that the plaintiff was not disabled and had the RFC "to perform the full range of light work . . . reduced by [certain] nonexertional limitations" (Tr. 345). Recognizing a combination of impairments of degenerative disc disease, history of multiple hernias, lacerations to the legs and arms, diabetes, asthma, antisocial personality disorder, depression, the ALJ found that the plaintiff could not perform "jobs requiring frequent lifting or carrying of more than ten pounds, occasional lifting or carrying of more than twenty pounds, or jobs not restricted to

15

routine, repetitive tasks involving one-to-two step instructions in a low stress environment not requiring contact with the public" (Tr. 344). The ALJ properly considered the plaintiff's medical records and his subjective complaints, as well as the testimony of his wife and the vocational expert. There is substantial evidence in the record to support his determination regarding the plaintiff's residual functional capacity. The plaintiff's complaint is without merit.

### *Plaintiff's Subjective Complaints*

The plaintiff contends the ALJ erred in failing to find his allegations of disabling pain and limited functional capacity to be credible.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).

Here, the case was previously remanded to the ALJ for a comprehensive credibility evaluation as required by 20 C.F.R. §§404.1529, 416.929 and Social Security Ruling (SSR) 96-7p (Tr. 353-54). Accordingly, the ALJ specifically considered:

> both medical and nonmedical evidence, including the use and effects of medications; precipitating and aggravating factors; duration and frequency of the symptoms; resultant functional restrictions; daily activities; treatments besides medications for pain; and observations by physicians and others concerning a claimant's behavior and efforts to work.

(Tr. 340.) He considered the fact that the plaintiff's laceration from the grinding stone accident had healed with normal range of motion and no sensory deficit (Tr. 338). He considered the fact that the plaintiff had no further complaints of hernia problems after his hernias were stabilized with a properitoneal mesh (Tr. 338). He considered the lack of

16

evidence to support the plaintiff's claims of severe side effects from medications (Tr. 341). He considered the fact that the plaintiff abandoned counseling services for depression through which his depression had been stabilized (Tr. 340). He also considered the fact that the plaintiff quit a Vocational Rehabilitation workshop evaluation through which he had good performance and attendance but had demonstrated a poor attitude and was "convinced that he was too disabled to get and hold a job"(Tr. 342).

The ALJ concluded that, "[t]he evidence as a whole does not support a finding that the claimant's subjective symptoms have occurred with such frequency and severity as to have precluded him from performing all substantial gainful activity on a sustained basis" (Tr. 341). The ALJ's credibility determination is supported by substantial evidence.

### CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court concludes the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed.

s/William M. Catoe
United States Magistrate Judge

March 7, 2005

Greenville, South Carolina

17